JAMES GANLEY, Plaintiff-Appellee, *v.* THE CITY OF CHICAGO *et al.*, Defendants-Appellants.

(No. 57142; 

First District (3rd Division)—March 7, 1974.

Richard L. Curry, Corporation Counsel, of Chicago (William R. Quinlan, Edmund Hatfield, and Paul T. Foxgrover, Assistant Corporation Counsel, of counsel), for appellants.

Anthony T. Buckun, Lawrence W. Weinstock, and David F. Holland, all of Chicago, for appellee.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

James Ganley, a real estate developer, applied to the Commissioner of Buildings of the City of Chicago for permits to construct three one-story, single-family residences at 6800, 6802 and 6804 North Olcott Avenue, Chicago. The permits were issued and Ganley immediately started excavating; he poured concrete foundations, put in sewers and did the back-filling for the buildings. On April 1, 1971, 3 weeks after permission to build was granted, the department of buildings revoked the permits and halted the construction. On July 13, 1971, the Chicago Park District designated the property as a park site and authorized acquisition of the land. Ganley then filed a complaint for mandamus to compel the reissuance of the permits. After a hearing, the trial court issued the writ.

The evidence showed that Ganley bought 100 front feet of land on North Olcott. The property consisted of four 25-foot lots numbered 22, 23, 24 and 25. (I.e., 6806, 6804, 6802 and 6800 North Olcott.) He paid $12,500 for lot 22 and $12,000 each for lots 23, 24 and 25. Lot 22 was vacant; he built a one-family brick house on the lot and sold it for $37,500. A large frame residence was situated on lots 23, 24 and 25. He intended to build houses on these lots similar to the one he had constructed on lot 22 and had the residence demolished for this purpose.

When the neighbors realized what was taking place they protested. Their complaints and demonstrations were heeded and the building permits were withdrawn.

Ganley was invited to attend a meeting in the building commissioner's office. He was told that his proposed buildings did not conform with the type and size of the other residences in the area, and he was asked to change his plans and build two houses instead of three on the 75 feet of land. Ganley, who had erected approximately 150 buildings during his 15 years in the real estate business, refused because, he said, he had between $42,000 and $43,000 invested in the 3 lots.

The principal contention of the City of Chicago and its Commissioner of Buildings is that Ganley is attempting to circumvent the minimum lot size restriction of the Chicago zoning ordinance by demolishing a single-family residence in order to erect houses on lots which are substandard in area. An amicus curiae brief, filed on behalf of the Edison Park Community Council, makes the same argument. Since the resolution of this contention is dispositive of this appeal and we find no merit to the defendants' other contentions, we will limit our discussion to whether the zoning ordinance permitted the construction undertaken by Ganley.

Ganley testified that the majority of houses in the area surrounding lots 23, 24 and 25 were on 25-foot lots, but there were vacant lots around the houses. He stated that the houses which he intended to build were comparable in value to the surrounding structures. The plat of the original subdivision was introduced into evidence. It showed that the pertinent side of the Olcott block was divided into 25 lots; 24 had 25 feet of frontage and 1 had 39 feet.

The chief code enforcement officer for the department of buildings testified that in the two-block area surrounding the three lots, 95% of the residences were on lots which averaged 50 feet. A code-enforcement supervisor testified that the average frontage was 50 to 75 feet. A land use map was received in evidence which showed that there were 11 residences in the 6800 block of Olcott in addition to the one purchased by Ganley. The map showed the condition of the four lots before Ganley bought them. The frame residence was on land which measured 75 feet x 147 feet. The lot next to the residence, at 6806 North Olcott, measured 25 feet by 147 feet and was vacant.

The pivotal issue between the parties concerns the interpretation of three articles of the Chicago Zoning Ordinance and their application to Ganley's property. Article 7.5—2 defines the minimum lot area permissible in a single-family residence district:

"In an R2 District, there shall be provided not less than 5,000 square feet of lot area per dwelling unit, except that in cases where the predominant number of lots of record on the effective date of this comprehensive amendment, fronting on the same side of the street between the two nearest intersecting streets, have a lot area less than that prescribed by the regulation of this district, then, and in that event, the lot area requirement shall be that of existing lot areas in the area previously described, but in no event shall the lot area requirement be less than 3,750 square feet." The Municipal Code of Chicago, 1971, ch. 194A, sec. 1, part A, art. 7.5—2.

■■ Lots 23, 24 and 25 are in an R2 single-family residence district. Each lot has an area of only 3,675 square feet, hence each one is 1,325 square feet less than the minimum number required in an R2 district. Furthermore, even if the lots came within the ordinance's exception they would not qualify for its benefits, for their square foot areas of 3,675 feet do not meet the ordinance's mandate that, "in no event shall the lot area requirement be less than 3,750 square feet." Thus, the buildings proposed by Ganley would violate the minimum requirements of article 7.5—2 and increase the density of the neighborhood.

Ganley, however, argued in the trial court and argues here that another provision of the zoning ordinance allows the contemplated buildings. Reliance is placed upon article 7.5(2) which states:

"In any Residence District a one-family dwelling may be established on a lot of record on the effective date of this comprehensive amendment regardless of the size of the lot; also if this lot of record is voluntarily increased in size and still does not comply with the minimum lot area requirement of the district, a one-family dwelling shall be permitted provided that all other requirements of this comprehensive amendment are met * * *." Municipal Code of Chicago, 1971, ch. 194A, sec. 1, part A, art. 7.5(2).

It is the City's position that article 7.5(2) applies to lots that are vacant and not to lots which have been improved, such as lots 23, 24 and 25, where a conforming use is removed in an attempt to avoid the applicable minimum lot area requirements. In support of this position, article 5.7—2 of the ordinance is cited. This article provides that:

"No improved zoning lot shall hereafter be divided into two or more zoning lots and no portion of any improved zoning lot shall be sold, unless all improved zoning lots resulting from each such division or sale shall conform with all the applicable bulk regu-

lations of the zoning district in which the property is located
* * *." Municipal Code of Chicago, 1971, ch. 194A, sec. 1, part
A, art. 5.7—2.

■■ Ganley protests that the defendant should not be permitted to make use of article 5.7—2 in this court because they did not cite this provision of the ordinance in the trial court. We regret that article 5.7—2 was not brought to the attention of the trial court. However, the defendants' theory on appeal, that an improved conforming parcel of land may not be divided to provide for lots which do not conform with the minimum area requirements of the zoning district, is the same as the one advanced by them in the trial court; the only difference in their respective positions is the authority urged in support of the theory. Therefore, the procedural rule of law that a party cannot advance a theory on review which was not raised in the trial court does not apply in the present instance.

■■ Article 5.7—2 implements the power of a municipality to regulate and limit the intensity of use of lot areas by providing for the continued conformity with zoning regulations, once a parcel of land has received a zoning status on an improved basis. (*Mitchell v. Zoning Board of Appeals* (1970), 125 Ill.App.2d 1, 260 N.E.2d 454.) The fact that a conforming parcel of land had been platted into lot sizes which were individually less than the minimum specifications required by the applicable zoning law, does not vest the owner of the parcel with the right to evade the zoning law by establishing nonconforming uses out of that parcel. See *Weber v. Village of Skokie* (1968), 92 Ill.App.2d 355, 235 N.E.2d 406.

It is important to note the difference between a "zoning lot" and a "lot of record." The zoning ordinance defines the terms as follows:

> "Lot of Record. A 'lot of record' is an area of land designated as a lot on a plat of subdivision recorded or registered, pursuant to statute, with the Recorder of Deeds of Cook County and the Ex-officio Examiner of Subdivisions of the City of Chicago.
> Lot, Zoning. A 'zoning lot or lots' is a single tract of land located within a single block, which (at the time of filing for a building permit) is designated by its owner or developer as a tract to be used, developed or built upon as a unit, under single ownership or control. Therefore, a 'zoning lot or lots' may or may not coincide with a lot of record." Municipal Code of Chicago, 1971, ch. 194A, sec. 1, part A, art. 3.2.

Ganley argues that lots 23, 24 and 25 do not come within the meaning of a zoning lot as defined in article 3.2 of the 1957 ordinance, because the "old house" built on them was constructed before the 1957 zoning

ordinance became effective, and that there was no evidence that their owner, following the passage of the ordinance of 1957, designated them to be used as one unit. As pointed out by him, the record is silent as to when the frame residence was built or whether a permit was obtained before it was built. However, prior zoning ordinances of the City of Chicago provided for zoning lots and the provisions were applicable to parcels of land used or intended to be used as one unit, or occupied or intended to be occupied by one building. Zoning Ordinance of 1942, section 2; Zoning Ordinance of 1923, section 2(m).

At the time of Ganley's purchase, lots 23, 24 and 25 were used as one entity, and one residence, 40 feet in width and 52 feet in length, was situated on them. Their status at that time was determined by their use, not as individual lots, but as an entire parcel. Although platted as three lots, they were used as one zoning lot which was in compliance with the minimum area restrictions of the zoning district.

■■ Permitting Ganley to build three structures on the one zoning lot would enable him to create three non-conforming uses where none existed before. It would contravene the intent of the zoning ordinance as a whole. It would not comply with the density provisions of article 7.5—2 and would violate the prohibition against the expansion of non-conforming uses implicit in article 5.7—2. Article 7.5(2) does not prevail over articles 7.5—2 and 5.7—2, and it is not an exception to them. Article 7.5(2), when read in conjunction with the other articles, permits the construction of a single-family residence on an unimproved lot of any size—if it was a lot of record before the passage of the zoning ordinance. If the lot has been improved, the density strictures of the ordinance must be observed. Article 7.5(2) does not exempt all lots of record from the minimum area restrictions, and improved lots, which are in conformity with the zoning regulations, do not revert to their original status when the improvement is removed.

The final order of the trial court was formulated upon the ground that the building permits were revoked without legal cause and that Ganley was entitled to their reissuance. In his petition, Ganley did not claim that the defendants were estopped from refusing to reissue the permits because of the work performed and the money spent by him after the permits were initially granted. However, in its oral decision, the court mentioned these factors as an additional reason for issuing the writ of mandamus. Ganley adopts this reason in his brief and claims that, after the permits were issued and he performed detailed work, he should be permitted to complete the work and use the property as intended.

The general rule in Illinois is that any substantial change of position,

expenditure, or incurrence of obligation occurring under a building permit validly issued is sufficient to create a right in the permittee which entitles him to complete the construction and to use the premises for the purposes originally authorized, irrespective of subsequent zoning or a change in zoning classification. *People ex rel. Interchemical Corp. v. City of Chicago* (1963), 29 Ill.2d 446, 194 N.E.2d 199; *Nott v. Wolff* (1960), 18 Ill.2d 362, 163 N.E.2d 809; *People ex rel. Gustafson v. Calumet City* (1968), 101 Ill.App.2d 8, 241 N.E.2d 512.

■■ The rule that a permittee has the right to construct a building after being issued a building permit and making substantial expenditures, is not applicable to this case. Following the granting of the permits, there was no zoning enactment nor change in zoning classification. The vesting of the right presupposes a legal building permit and a substantial change of position incurred in good faith reliance thereon by the property owner. (*City of Chicago v. Zellers* (1965), 64 Ill.App.2d 24, 212 N.E.2d 737.) *Ganley* followed normal administrative procedure in submitting his plans. The permits were issued by a ministerial officer. The illegal issuance of permits by a ministerial officer does not estop a muncipality from relying on the illegality, notwithstanding the fact that the applicant may have expended money or incurred obligations in good faith and in substantial reliance upon the permit (*City of Rockford v. Sallee* (1970), 129 Ill.App.2d 75, 262 N.E.2d 485), unless the applicant was actively misled by the officer (*Cities Service Oil Co. v. City of Des Plaines* (1961), 21 Ill.2d 157, 171 N.E.2d 605). A city cannot be estopped by an act of its agent beyond the authority conferred upon him; anyone dealing with a governmental body takes the risk of having accurately ascertained that he who purports to act for it stays within the bounds of his authority. (*People ex rel. American National Bank & Trust Co. v. Smith* (1969), 110 Ill.App.2d 354, 249 N.E.2d 232.) A building permit cannot be granted in violation of the terms of a zoning ordinance; an unauthorized permit is a nullity and it confers no right on the permittee. (10 I.L.P. (1965), Cities, Villages and Other Municipal Corporations, sec. 1147, at 79.) No greater right can be conferred upon a permittee by a building permit than those sanctioned by the ordinance itself. 1 Yokely, Zoning Law and Practice (3d ed. 1965), sec. 9—6, at 412-13.

■■ Mandamus is not a writ of right. It is an extraordinary remedy and the relator seeking the writ must show a clear legal right to the relief requested. (*Lenit v. Powers* (1969), 120 Ill.App.2d 411, 257 N.E.2d 142; *Houswerth v. Seidel* (1964), 47 Ill.App.2d 112, 197 N.E.2d 271.) At best, Ganley's legal right to the relief he sought was questionable, and the writ of mandamus should not have been issued.

A question has been raised as to the effect of the Chicago Park District

ordinance on Ganley's use of the North Olcott Avenue property. The ordinance, which authorized acquisition of the land for park purposes, has no effect on our decision which adjudicates the dispute between Ganley and the City of Chicago. Under our decision, Ganley may divide the vacant property into two conforming lots and he is entitled, as the City has recognized, to a building permit for a residence on each lot. Whether he should proceed to develop the property is a matter between him and the Park District. However, he has pointed out, and the City concedes, that nothing has been done by the district to implement the ordinance from the date of its passage in July 1971 up to the time of oral argument in this court. This cause will therefore be remanded to the trial court for the purpose of conducting a hearing as to whether the district intends to acquire the land for use as a public park. If the district does so intend it should proceed with the acquisition; if it does not it should repeal its ordinance.

Reversed and remanded with directions.

McNAMARA, P. J., and McGLOON, J., concur.