COUNTY OF KAUAI, Petitioner-Appellee, *v.* PACIFIC STANDARD LIFE INSURANCE COMPANY and GRAHAM BEACH PARTNERS, Respondents-Appellees, and COMMITTEE TO SAVE NUKOLII, Respondent-Appellant, *v.* EDUARDO E. MALAPIT, in his capacity as MAYOR OF THE COUNTY OF KAUAI, Third Party Defendant-Appellee

NO. 8267

(CIVIL NO. 2388)

OCTOBER 14, 1982

RICHARDSON, C.J., LUM, J., CIRCUIT JUDGE GREIG IN PLACE OF NAKAMURA, J., RECUSED, AND RETIRED JUSTICES OGATA AND MENOR ASSIGNED TEMPORARILY

OPINION OF THE COURT BY RICHARDSON, C.J.

This appeal considers the effect of a county referendum nullifying a zoning ordinance that had authorized resort development at Nukolii, Kauai, when (1) the referendum petition drive began before the developers applied for any government permits, (2) the referendum issue was certified before any permits were issued, and (3) the referendum vote occurred after the county government had approved the developers' resort plans and had issued building permits. The parties involved as Appellees are Pacific Standard Life Insurance Co. and Graham Beach Partners (hereafter referred to as the Developers) and the County of Kauai and its mayor (hereafter referred to as the County). Appellant is Committee to Save Nukolii, an unincorporated association of Kauai County residents who represent the referendum petitioners and oppose resort development at the Nukolii site.

On the day the referendum results were certified, the County filed this action for declaratory judgment and injunctive relief, asking the circuit court to determine the relative legal rights and duties of the respective parties pursuant to the initiative and referendum article of the county charter. In granting the Developers' motion for summary judgment, the lower court ruled that they had acquired vested rights to the resort development and that the County was equitably estopped from prohibiting the development notwithstanding that the electorate had, by a nearly 2-1 margin, disapproved the rezoning ordinance. We reverse.

I.

We agree with the lower court that there is no genuine issue of material fact to be determined. On appeal from summary judgment, our function therefore is to resolve questions of law applicable to the undisputed facts contained in the record.

General comprehension of the controversy may be obtained from the following chronological outline of events:

1. In 1974, the Developers purchased the subject shoreline property, comprising 60.425 acres located at Hanamaulu, Kauai, and known as Nukolii. The land use classification then was open

space and agriculture, which did not allow resort development.[1]

2. In November 1977, the Kauai County General Plan was amended to designate the parcel as "resort." The Developers subsequently sought an amendment to the Comprehensive Zoning Code, proposing to build three hotels of 500 rooms each on the 60.425-acre parcel. On February 1, 1979, the Kauai County Council amended the zoning code from "open/agriculture" to "resort", but the ordinance scaled down the original proposal to first-phase development of 150 condominium units and one 350-room hotel on 25 acres plus payment to the County of an "in lieu" fee for recreational facilities totalling $500,000. The mayor approved the ordinance on February 2, 1979. A month later, Appellant circulated the petition to repeal the resort zoning ordinance pursuant to the referendum provisions of the county charter.

3. On December 27, 1979, Developers applied for a Special Management Area use permit. Thereafter, on January 15, 1980, Appellant submitted the referendum petition to the County and on January 23 was allowed to intervene in the planning commission proceedings on the Developers' permit application.

4. On January 30, 1980, the county clerk certified the referendum petition, containing more than 4,000 signatures, as sufficient under the pertinent charter provisions. On February 5, 1980, the Kauai County Council sustained the resort zoning ordinance and placed the referendum question on the 1980 general election ballot.

5. On April 9, 1980, being advised by legal counsel that certifi-

---

[1] The State exercises land use control by designating urban, rural, agriculture, and conservation use boundaries, HRS ch. 205 (1976 & Supp. 1981), for which the counties provide detailed maps. In 1976, the State changed the agriculture designation of the Nukolii parcel to urban, leaving only eight acres in the conservation or open space category. Conforming amendments to the Kauai County General Plan and the more specific County Comprehensive Zoning Code were required before the permit system could proceed. *See* Neighborhood Bd. No. 24 v. State Land Use Comm'n, 64 Haw. 265, 639 P.2d 1097 (1982); HRS § 205-4.5 to -5 (1976 & Supp. 1981). In addition, the Coastal Zone Management Act, HRS ch. 205A (Supp. 1981), required county special management area use permit approval before any other necessary permits could be issued, including county building permits authorizing actual construction.

cation of the petition did not suspend the resort zoning ordinance, the Kauai County Planning Commission approved the Developers' application for a Special Management Area use permit. Appellant timely appealed the planning commission's decision and the no-suspension ruling. The circuit court affirmed both decisions on July 7, 1980, and the judgment in that proceeding was appealed to this court but later withdrawn.

6. On August 4, 1980, the Developers applied for building permits for the hotel and condominium structures. The County issued permits covering the 150 condominium units the next day.

7. On August 27, 1980, Appellant sought an injunction to prohibit construction pursuant to the condominium building permits, alleging they were not validly issued. The circuit court denied the request for injunctive relief on September 5.

8. On November 3, 1980, the County issued a building permit for construction of a 350-room hotel on the Nukolii site. Four of the six departmental signatures necessary for the permit were obtained this day.

9. On November 4, 1980, the electorate approved the referendum to repeal the resort zoning ordinance by a vote of 10,794 to 5,618. The election results were certified by the county clerk on November 25.

The County filed this action on November 25, 1980, naming the Developers and Appellant as parties, and later supported the Developers' motion for summary judgment. Appellant filed several counterclaims, cross-claims, and third-party complaints against the mayor. The lower court dismissed these claims and Appellant's related motion for partial summary judgment on February 9, 1981, and concurrently granted the Developers' motion for summary judgment. Finding first that certification of the petition did not suspend the zoning ordinance and that all permits were validly issued, the circuit court concluded as follows:

> The Court further holds that Respondents Pacific Standard Life Insurance Company and Graham Beach Partners, having incurred substantial expenditures in reliance upon the existing zoning, did acquire vested rights to continue and complete the condominium and hotel project at Nukolii. This conclusion is

based upon . . . [section 5.11 of the Kauai County Charter]. The vesting occurred prior to the issuance of the condominium building permits on August 5, 1980, and prior to the date of the referendum which the Court deems to be November 4, 1980.

The Court also holds that the County of Kauai is equitably estopped from prohibiting the continuation and completion of the Nukolii project. This holding is based on *Denning v. County of Maui*, 52 Haw. 653, [485 P.2d 1048 (1971);] *Allen v. City & County of Honolulu*, 58 Haw. 432, [571 P.2d 328 (1977);] *Life of the Land v. City Council*, 60 Haw. 446, [592 P.2d 26 (1979);] and *Life of the Land v. City Council*, 61 Haw. 390 [606 P.2d 866 (1980)].

Decision, Order and Judgment 2-3 (Feb. 9, 1981).

## II.

The issue before us is one of first impression in this jurisdiction, involving a conflict between the private interest of the landowners to develop their property and the public interest of the electorate to effectively determine what the land use policy shall be. Resolution of this issue must begin with the Kauai County Charter, which is the source of the electorate's power.

Article V of the charter, establishing initiative and referendum procedures, was adopted in 1976.[2] The referendum process is "a

---

[2] Our discussion will refer to the following provisions of article V, not otherwise quoted in the text, that were in effect at all times relevant to this appeal:

Section 5.02. *Limitations to Powers.* The initiative power and the referendum power shall not extend to any part or all of the operating budget or capital budget; any financial matter relating to public works; any ordinance authorizing or repealing the levy of taxes; any emergency legislation; any ordinance making or repealing any appropriation of money or fixing the salaries of county employees or officers; any ordinance authorizing the appointment of employees; any ordinance authorizing the issuance of bonds; or any matter covered under collective bargaining contracts.

Section 5.03B. Voters seeking referendum on an ordinance shall submit a referendum petition addressed to the council, identifying the particular ordinance and requesting that it be either repealed or referred to the voters of the county.

Section 5.03C. Each initiative or each referendum petition must be signed by not less than twenty percent (20%) of the number of eligible registered voters in

basic instrument of democratic government." *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 679 (1976). Accordingly, it is a clear exception to the general reservation of legislative power to the Kauai County Council.[3] "The power of the voters to approve or reject ordinances that have been passed by the county council . . . shall be the referendum power." Charter of Kauai County § 5.01B, *reprinted in* 2 HRS app. at 680 (1976). With certain exceptions not here relevant, all ordinances enacted after January 2, 1977, are subject to the referendum power, *id.* §§ 5.02, .10.

Once a referendum petition is certified, which requires signature of no fewer than twenty percent of the number of eligible registered voters in the last general election, the council must reconsider the ordinance within thirty days and either repeal or sustain the measure, *id.* §§ 5.03C, .07A. "If the council . . . fails to repeal an ordinance reconsidered pursuant to a referendum petition, it shall . . . refer the reconsidered ordinance concerned to the voters of the county at the next general election." *Id.* § 5.07B. The council may, however, provide for a special election, *id.* § 5.07C. A majority vote cast on the referendum issue is required to repeal the subject ordi-

---

the last preceding general election.

Section 5.07. *County Council Action On Petitions.* A. The county council shall proceed immediately to consider an initiative or referendum petition which has been determined sufficient in accordance with the provisions of this article. . . . If a referendum petition is concerned, the ordinance to which that petition is directed shall be reconsidered by the council; and not later than thirty (30) days after the date on which the petition was determined sufficient, the council shall, by ordinance, repeal, or, by resolution, sustain the ordinance.

. . . . .

C. The council may, in its discretion, and under appropriate circumstances, provide for a special election.

Section 5.09. *Results of Election.* . . . If a majority of the voters voting upon a referendum ordinance shall vote against it, the ordinance involved shall be considered repealed upon certification of the election results.

Section 5.10. Upon approval by a majority of the votes cast on the proposal, the charter amendment shall take effect upon all legislative acts not excluded herein enacted after January 2, 1977.

[3] The pertinent section of the Kauai County Charter reads as follows:

Section 3.01. *Legislative Power.* The legislative power of the county shall be vested in and exercised by the county council, except as otherwise provided by this charter.

nance, and repeal is effective upon certification of the election results, *id.* § 5.09.

Cognizant of the primary objective of article V, to effect legislation by plebiscite, we now focus on the intended meaning and mitigating effect of section 5.11, applicable to successful referenda. Specifically, section 5.11 of the charter provided as follows at all times relevant to this appeal:

> A referendum that nullifies an existing ordinance shall not affect any vested rights or any action taken or expenditure made up to the date of the referendum.

While there is no legislative history to section 5.11, we presume that the section stands for the general proposition that a successful referendum may not, under certain circumstances, operate to repeal an ordinance as it applies to certain persons. As we noted in *Allen v. City & County,* 58 Haw. 432, 571 P.2d 328 (1977), a case involving land use, this general principle has been embodied in two similar yet theoretically distinct theories: vested rights and equitable estoppel. This distinction is as follows: "Estoppel focuses on whether it would be inequitable to allow the government to repudiate its prior conduct; vested rights upon whether the owner acquired real property rights which cannot be taken away by government regulation." *Id.* at 435, 571 P.2d at 329 (quoting Heeter, *Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes,* 1971 Urb. L. Ann. 63, 65).

In the land use context, the vested rights doctrine was employed synonymously with the estoppel theory by a majority of courts at the time the charter amendment was drafted and adopted. *See, e.g., Anderson v. City Council,* 229 Cal. App.2d 79, 89, 40 Cal. Rptr. 41, 47 (1964); *Meridian Development Co. v. Edison Township,* 91 N.J. Super. 310, 220 A.2d 121 (Super. Ct. Law Div. 1966); 3 A. Rathkopf, The Law of Zoning and Planning 57-6 to -7 (1964); Cunningham & Kremer, *Vested Rights, Estoppel and the Land Development Process,* 29 Hastings L.J. 625, 648 (1978); Heeter, *supra.* At that time, the only decision addressing the vested rights issue in this jurisdiction enunciated zoning estoppel principles, *Denning v. County of Maui,* 52 Haw. 653, 658-59, 485 P.2d 1048, 1051 (1971). Thus, while we note the constitutionally based aspect of "vested rights" later, we will discuss section 5.11 primarily as an embodiment of equitable estoppel

theory.

We reject a literal interpretation of that portion of section 5.11 which provides that a referendum "shall not affect . . . any action taken or expenditure made up to the date of the referendum," for the effect of such a construction would be to grandfather all activities the referendum sought to prevent.[4] "[E]ven in the absence of statutory ambiguity, departure from literal construction is justified when such construction would produce an absurd and unjust result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act." *Pacific Insurance Co. v. Oregon Automobile Insurance Co.,* 53 Haw. 208, 211, 490 P.2d 899, 901 (1971). *Cf. In re Sanborn,* 57 Haw. 585, 591-94, 562 P.2d 771, 775-76 (1977) (statutory language regarding land registration not dispositive when in conflict with overriding public policy).

Finally, we note that the "date of the referendum" in section 5.11, prior to which all elements of estoppel must be met for the provision to be applicable, is the date of the vote. Thus, any "action taken or expenditure made" after the vote but before certification of election results is irrelevant for purposes of determining whether the protection of section 5.11 has been invoked.

### III.

Having held that the Kauai County Charter protects development rights vested by application of the common law principles of zoning estoppel, we find that the lower court erred in its application of those principles to the undisputed facts of this case. The specific operative facts preclude estoppel to defeat the zoning policy established for the Nukolii site by the electorate in November 1980.

In general, the zoning estoppel theory modifies hornbook law that "permits for buildings and businesses are not per se protected against revocation in effect by subsequent enactment or amendment of zoning laws prohibiting the building, business or use for which

---

[4] For example, a referendum nullifying an ordinance that had authorized certain classes of business to sell liquor or fireworks could not affect licensed dealers and would be a futile exercise in self-governance. *See* Brown Distrib. Co. v. Oklahoma Alcoholic Beverage Control Bd., 597 P.2d 324 (Okla. 1979) (liquor licenses do not involve vested property rights).

they have been issued." 8 E. McQuillan, Municipal Corporations § 25.156, at 459 (3rd ed. rev. 1976) (footnote omitted). Despite a plethora of case law on the subject of zoning estoppel, few courts have applied the theory in the unique context of zoning referenda.[5]

The only case in which this court held that a county was estopped from enforcing a zoning ordinance was *Life of the Land v. City Council,* 61 Haw. 390, 606 P.2d 866 (1980).[6] In considering the estoppel aspect of the case, we applied the following general rule which is permeated by the good-faith requirement of equity:

> The doctrine of equitable estoppel is based on a change of position on the part of a land developer by substantial expenditure of money in connection with his project in reliance, not solely on existing zoning laws or on good faith expectancy that his development will be permitted, but on official assurance on which he has a right to rely that his project has met zoning requirements, that necessary approvals will be forthcoming in due course, and he may safely proceed with the project.

*Id.* at 453, 606 P.2d at 902. Put another way, "[t]he critical questions become: (1) What reliance is 'good faith'; (2) what sums are 'substantial'; (3) what constitutes 'assurance' by officials; and (4) when does a developer have a right to rely on such assurances?" Callies, *Land Use: Herein of Vested Rights, Plans, and the Relationship of Planning and Controls,* 2 U. Hawaii L. Rev. 167, 174 (1979). Because the logical analytical progression begins with the last two questions, we shall consider these together first.

---

[5] *See* Andover Dev. Corp. v. City of New Smyrna Beach, 328 So.2d 231 (Fla. Dist. Ct. App. 1976) (estoppel); Steuart Petroleum Co. v. Board of County Comm'rs, 276 Md. 435, 347 A.2d 854 (1975) (no estoppel); Meridian Dev. Co. v. Edison Township, 91 N.J. Super. 310, 220 A.2d 121 (Super. Ct. Law Div. 1966) (no estoppel). *See also* Brown Distrib. Co. v. Oklahoma Alcoholic Beverage Control Bd., 597 P.2d 324 (Okla. 1979).

[6] *Life of the Land* was an appeal from summary judgment in favor of the developers who had obtained a building permit to construct a condominium in downtown Honolulu. The permit was issued after the city council authorized the specific project but before the effective date of a newly enacted zoning ordinance that reduced the maximum height and setback for structures in the affected area. In affirming, this court also held, as a matter of legislative history, that the restrictive ordinance did not apply to the development project.

## A.

The action that constituted official assurance in *Life of the Land* was Honolulu council approval of the developers' application for a variance or exemption to an interim moratorium ordinance on building permits covering the project site. We held that the approval was nonlegislative implementation of an existing ordinance, 61 Haw. at 421-25, 606 P.2d at 886-88. In granting the variance, the council imposed conditions precedent to issuance of the condominium building permit. In short, the variance constituted "final discretionary action" on the specific project.[7]

There was no question that the developers had a right to rely on this official assurance. The county's final discretionary action conformed with the intent, purpose, and spirit of the amendments to the overall zoning scheme, *id.* at 433, 463, 606 P.2d at 892, 907, and with the specific variance procedures designed to implement the objectives of the moratorium ordinance, *id.* at 433, 606 P.2d at 892.

*Life of the Land* therefore teaches that final discretionary action constitutes official assurance for zoning estoppel purposes.[8] This rule acknowledges the incremental nature of the modern development process and strikes the appropriate balance between competing private and public interests. It preserves government control over development until the government's own process for making land use decisions leaves nothing to discretion.[9] A proper under-

---

[7] 61 Haw. at 446, 606 P.2d at 899. A second council variance approval had amended the first action with retroactive effect to the prior approval date, *id.* at 436, 440-42, 606 P.2d at 893, 896-97, which explains how final discretionary action involved two council votes. Our decision recognized that the council might have reserved its power to give final approval upon compliance review but did not, *id.* at 441, 606 P.2d at 896; the council did reserve its jurisdiction based on contingencies that never materialized and therefore that jurisdiction lapsed.

[8] Our rule marks the midpoint in a wide spectrum of possibilities represented by the decisions of other jurisdictions. *Compare* Spindler Realty Corp. v. Monning, 243 Cal. App.2d 255, 53 Cal. Rptr. 7, *cert. denied,* 385 U.S. 975 (1966) (valid building permit is threshold requirement for establishing vested right), *with* Mercer Enterprises, Inc. v. City of Bremerton, 93 Wash.2d 624, 611 P.2d 1237 (1980) (rights vested at time of developer's permit application).

[9] Accordingly, in *Life of the Land* we held that the building department's function regarding the condominium building permit was "purely ministerial, to process the

standing of the last discretionary action in a governmental process will lead to predictable results consistent with the important public policy considerations that underlie Hawaii's estoppel rule.

In each case, then, the central focus must be on the existing legal process. Identification of the operative mechanisms also will determine whether analogous governmental actions give rise to a similar right to rely. We now apply these principles to the facts before us.

### B.

Since 1976 the county process for advancing development on Kauai potentially involved administrative officials, the county council, and the electorate through the initiative and referendum power. The referendum mechanism is " 'an exercise by the voters of their traditional right through direct legislation to override the views of their elected representatives as to what serves the public interest.' " *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 678 (1976) (quoting *Southern Alameda Spanish Speaking Organization v. Union City*, 424 F.2d 291, 294 (9th Cir. 1970)).

Certification of a petition triggers the referendum mechanism. Until that point, the complicated modern permit system controls development. Zoning estoppel analysis therefore must focus on the status of government approval for any proposed project at the time the referendum mechanism is activated.

If a developer obtains final discretionary action for a project under the permit system while the referendum mechanism remains dormant, then section 5.11 of the Kauai charter and the common law of zoning estoppel will recognize that action as official assurance on which a developer has a right to rely. The law looks to the conduct of the parties in light of the operative procedures for advancing development. Certification of a referendum does not intervene retroactively into the permit system.

If a developer has not received final discretionary action under the permit system before the referendum mechanism is operative,

application for compliance with all applicable statutes, ordinances, rules and regulations, and the conditions attached to the approvals, and to issue the requested building permit after such processing." 61 Haw. at 454, 606 P.2d at 903.

then the estoppel analysis will recognize that timely intervention of the referendum procedure has made discretionary approval or disapproval of underlying zoning an integral part of the development process as applied to that project. Any administrative or council approvals given after certification and before a referendum vote have no estoppel effect. Where final approval of a project under the permit system occurs in the intervening period, it does not constitute final discretionary action in the development process; in that circumstance, the referendum vote constitutes final discretionary action on which a developer has a right to rely for estoppel purposes.[10] Where intervening administrative or council action leads to issuance of valid permits, a developer may advance the project consistent with those permits but only at the known risk that final discretionary approval will be denied.

In this case it is undisputed that the last discretionary permit action by the County was the April 9, 1980 vote of the planning commission authorizing a Special Management Area (SMA) use permit for the Nukolii development. The SMA permit approval was nonlegislative action imposing new conditions on the development which expressly made compliance therewith precedent to issuance of a building permit. The SMA permit is analogous to the variance granted in *Life of the Land* and would constitute final discretionary action for estoppel purposes[11] but for the fact that the zoning referendum already had been certified, thereby enabling the electorate to exercise its discretion regarding the proposed resort. The SMA permit therefore did not advance the Developers' right to proceed other than at their own risk.[12]

---

[10] Where the electorate's power of referendum is the source of council reconsideration of a zoning ordinance, the same analysis would apply to deny estoppel effect to any administrative approvals obtained between certification and council repeal of the ordinance pursuant to a certified referendum.

[11] Appellant correctly notes that the SMA approval was expressly conditioned, *inter alia*, on state health department approval of sewage disposal plans for the project in conformity with the relevant state statute. We do not consider whether final discretionary administrative action under these facts would be health department approval of the sewage treatment plans because we find that even the earlier county SMA approval does not meet zoning estoppel requirements here.

[12] Although we give collateral estoppel effect to the July 7, 1980 circuit court judgment affirming the planning commission's SMA permit decision and ruling that

The building permits stand in the same shadow cast by certification of the referendum and do not create an irrevocable right to proceed with the Nukolii project. Simply stated, the official assurance upon which the Developers would have a right to rely in this case could come only from the voters, and they chose to withhold it.

Appellees fail to perceive any difference between anticipated legislation in *Life of the Land* and the pending referendum here. They argue that notice of public opposition to the condominium design did not foreclose equitable estoppel there, and no greater effect should be given to public opposition manifested here by the certified referendum.

Our decision in *Life of the Land* emphasized that the primary objective of the moratorium ordinance, to ensure effectiveness of the finalized zoning policy, was not frustrated when the same body that had the sole legislative power in that county to determine the final zoning also retained exclusive power to grant a variance to the moratorium. 61 Haw. at 432-33, 606 P.2d at 891-92. Although public opposition was addressed in the variance process, it could have no direct legal impact on council actions because the electorate's power to disapprove Honolulu council actions is limited to the election process. In contrast, there hardly could be a clearer case in which the primary objective of article V of the Kauai charter would be improperly frustrated by application of zoning estoppel

---

certification of the referendum did not suspend the zoning ordinance, neither ruling precludes enforcement of the referendum results. The validity of the SMA decision is not at issue here, only its zoning estoppel value. Referendum certification simply made subsequent SMA permit approval a preliminary step in the development process.

Similarly, the no-suspension ruling fails to advance the Developers' claim. Disregarding post-certification approvals for estoppel purposes is not different from disallowing actions taken or expenditures made after the referendum vote but before the election results are certified. *See* discussion in Part II, *supra*. The ordinance remains in effect during both periods and is repealed on certification of election results. Moreover, where final discretionary approval was obtained before the referendum is certified, a no-suspension rule contemplates that ministerial functions will be discharged after referendum certification and while the ordinance remains in effect. Once the ordinance is repealed, section 5.11 of the charter is available to mandate issuance of ministerial permits to a developer who is in compliance with and has made substantial expenditures in reasonable reliance on final discretionary approval received before certification of the referendum. *See* note 9, *supra*.

than this one where the referendum to repeal the zoning ordinance authorizing the Nukolii resort was certified before any necessary development permits had been issued.

We hold, as a matter of law, that any approvals or permits for a proposed development issued after certification of a referendum to repeal a zoning ordinance affecting the project site but before termination of the referendum procedure do not constitute official assurance on which the developer has a right to rely. Because the government had not taken final discretionary action authorizing the Developers' project before the referendum was certified, the County is not estopped from enforcing prior zoning that prohibits resort development at Nukolii and resulted from the referendum.

The estoppel analysis in this case terminates with certification of the referendum. Therefore, it is irrelevant whether the Developers made substantial expenditures on the Nukolii project before the referendum vote. We will, however, briefly discuss the impact that the pending referendum had on the good-faith element of expenditures because independent consideration of this matter supports our holding that there was no official assurance on which the Developers had a right to rely in making expenditures.

### C.

There is no estoppel effect to deny permit revocation where the claimed substantial "expenditures are not made in good faith." 8 E. McQuillan, Municipal Coroprations § 25.157, at 462 (3rd rev. ed. 1976) (footnote omitted). In considering whether a developer's expenditures were made in good faith, we employ an objective standard that reflects "reasonableness according to the practices of the development industry." Cunningham & Kremer, *supra,* at 720.

Zoning estoppel is not intended to protect speculative business risks. Thus, an expenditure made in compliance with underlying zoning but before final discretionary action will be disregarded for estoppel purposes. *Life of the Land, supra,* 61 Haw. at 455, 606 P.2d at 903.

Based on the Developers' exhibits, we calculate that they expended $158,797.64 for planning and design of the Nukolii project from the date the resort zoning ordinance was enacted in February

1979 until the referendum was certified.[13] These costs reflect reasonable reliance placed on a preliminary step in the development process[14] and are considerably less than the post-zoning expenditure of $286,345.67 we disregarded in *Life of the Land.* In short, they create no estoppel effect even though they were made in good faith.

When we apply the objective standard of good faith to facts in the record regarding subsequent expenditures, we find that the Developers did not reasonably rely on post-certification actions of county officials to insulate the Nukolii project from the impact of a successful referendum. They proceeded at risk that the referendum would pass, as indeed it did.

The bulk of the Developers' expenditures occurred between August 5, 1980, when the condominium building permits were issued, and the date of the referendum.[15] The largest single trans-

---

[13] The aggregate figure is exclusive of $16,533.06 paid to a tourism consultant and $150.00 paid to the County as a permit application fee, neither of which do we deem relevant for estoppel purposes. Based on close scrutiny of the Developers' exhibits of billings and payments, the aggregate total is derived from the following subtotals:

| | |
|---|---|
| Architectural fees: | 31,352.96 |
| Archaeological research: | 1,000.00 |
| Planning & Development Consultant fees: | 125,456.68 |
| Appraisal fees: | 988.00 |

[14] In addition to the specific zoning ordinance and in reliance thereon, the Developers met with county planning officials in late 1979 to pursue design and other details of the proposed Nukolii project. These private discussions with administrative officials may have given rise to a "good faith expectancy," 61 Haw. at 453, 606 P.2d at 902, that the planning commission eventually would approve the SMA permit application, incorporating the informal agreements reached in these meetings. Again, the reasonableness of expenditures based on these preliminary steps is not questioned, but that does not change the estoppel analysis.

[15] Our computation is not for the purpose of considering the substantial nature of expenditures and does not account for revocable sums. Based on the Developers' exhibits, our aggregate calculation for the period totals $3,532,897.23, including the $639,720 county "in lieu" fee and facilities reserve charge and the $108,750 earthwork contract completed before the referendum vote, for which there is no record of payment. County permit fees of $44,655.35 were excluded from the figure.

The record also reveals a total of $1,218,325.53 spent by the Developers while the SMA permit decision was under review by the circuit court. These expenditures must be disregarded outright as speculative. *See* 61 Haw. at 414, 454, 606 P.2d at 882, 903; *Life of the Land v. City Council,* 60 Haw. 446, 450-51, 592 P.2d 26, 29 (1979); *Meridian Dev. Co. v. Edison Township,* 91 N.J. Super. 310, 316, 220 A.2d 121, 125

action was the construction loan commitment fee received by Honolulu Federal Savings & Loan Association on September 25, 1980, when the loan agreement for interim and permanent financing of the condominiums was executed. Honolulu Federal expressly reserved its right to terminate the agreement if the referendum passed in the November election. A separate provision of the agreement independently reserved the lender's right of termination for noncompliance with the presale requirement involving the condominium units.[16]

Even before the loan agreement was executed, the Hawaii Real Estate Commission was warning potential condominium investors about the referendum, based on information provided by the Developers. The commission's August 1980 report on the Nukolii project, which a purchaser must receive before entering a sales contract, contained the following cautionary statements (R. 493):

PURCHASERS SHOULD BE AWARE HOWEVER THAT THEIR RIGHTS AS PURCHASERS OF UNITS IN THE PROJECT MAY BE AFFECTED BY AND ARE SUBJECT TO THE OUTCOME OF THE REFERENDUM PETITION AND THE RESULTS OF THE NOVEMBER 1980 GENERAL ELECTION WITH RESPECT TO THE ZONING FOR THE PROJECT. THE DEVELOPER HAS SECURED THE NECESSARY BUILDING PERMITS FOR THE PROJECT AND PLANS TO COMMENCE CONSTRUCTION PRIOR TO THE NOVEMBER 1980 GENERAL ELECTION. AS DESCRIBED ABOVE, THE LITIGATION AND APPEAL BY THE SAVE NUKOLII COMMITTEE MAY HAVE AN IMPACT ON THE DEVELOPER'S ABILITY TO COMMENCE AND COMPLETE CONSTRUCTION OF THE PROJECT.

Taken together, the construction loan agreement and the real estate commission report demonstrate that the development indus-

---

(Super. Ct. Law Div. 1966). The fact that the appeal of the circuit court judgment was pending in this court until January 1982 does not change the estoppel analysis. *See* Solarana v. Industrial Elecs., Inc., 50 Haw. 22, 428 P.2d 411 (1967); note 12, *supra.*

[16] The agreement, covering an aggregate loan of $50,500,000, required enforceable sales contracts for 65% of the 150 units by the January 31, 1981 closing date, although Honolulu Federal could extend the compliance date. As of November 3, 1980, there were 60 reservations agreements but only 4 sales contracts (R. 569). Termination based on either presale noncompliance or the referendum results required the lender to refund most of the Developers' $1,320,000 commitment fee and any subsequent loan fees.

try recognized reliance on county approvals and permits would have been unreasonable under the circumstances. Those documents, both acquiesced in by the Developers, expressly acknowledged the potential importance of the pending referendum upon related business transactions.

Under these circumstances, we are persuaded that the good-faith requirements of zoning estoppel are not demonstrated by the Developers here.[17] The expenditures made toward commencing construction before the referendum vote were not only speculative but also fell short of good faith as manifestations of a race of diligence to undermine the referendum process.[18]

Finally, we note that even good-faith expenditures will be disregarded if made in reliance on an invalid building permit. *Pettitt v. City of Fresno,* 34 Cal. App.3d 813, 110 Cal. Rptr. 262 (1973), *appeal dismissed for want of substantial federal question,* 419 U.S. 810 (1974); *Ganley v. City of Chicago,* 18 Ill. App.3d 248, 309 N.E.2d 653 (1974); *Sorenti v. Board of Appeals,* 345 Mass. 348, 187 N.E.2d 499 (1963). Here, the condominium building permits were not valid until Oc-

---

[17] On appeal, the County argues that Appellant did not demonstrate diligence and good faith by challenging the 1979 zoning ordinance when it might have initiated a referendum to repeal the 1977 ordinance that amended the General Plan. Suffice it to say that the record reveals the public first had notice of the proposed Nukolii resort complex when the Developers applied for rezoning; the county charter endowed the voters with referendum power to nullify the council's detailed zoning ordinance; and the County should not now be heard to complain because Appellant vigorously exercised its rights under the charter.

[18] *See* Aries Dev. Co. v. California Coastal Zone Conservation Comm'n, 48 Cal. App.3d 534, 122 Cal. Rptr. 315 (1975). Consideration of a developer's race to complete a project before adoption of anticipated restrictive legislation usually reflects a subjective test of good faith, complicated by the uncertainty inherent in the normal legislative process. Here, however, the Developers knew the precise date the final zoning decision would be determined by referendum, thereby permitting an objective assessment of reasonableness regarding the scope and costs of expenditures made and obligations incurred within the known timetable.

The Developers deny that their good faith is impugned by having submitted plans for an effluent irrigation sewage system in order to avoid a six-month delay in testing a well injection system. As a practical matter, such delay would have foreclosed issuance of any building permits before the referendum vote. (R. 306, 830-31). The Developers nonetheless candidly admit they never intended to use the originally submitted effluent irrigation system but proposed it on an interim basis to satisfy the County (R. 149, 162, 307-08).

tober 31, 1980, four days before the referendum vote.[19] The Developers' exhibits show a single expenditure during the four-day interval, the $24,907.50 hotel building permit fee.

The foregoing analysis, based on section 5.11 of the Kauai County Charter and the principles of equitable estoppel enunciated in this jurisdiction, compels the conclusion that full effect must be given the November 4, 1980 referendum decision of the electorate repealing the resort zoning ordinance as applied to the Nukolii development. This conclusion is based on a concept of "vested rights," as that term is used in the charter, derived from equity.

## IV.

Our holding that the County is not equitably estopped from enforcing the 1980 zoning referendum as applied to the Developers' project is consistent with constitutional concepts underlying the vested rights doctrine. As we noted before, the constitutional analysis rarely produces a different result even though it focuses on "whether the owner acquired real property rights which cannot be taken away by government regulation." *Allen v. City & County, supra,* 58 Haw. at 435, 571 P.2d 329 (quoting Heeter, *supra,* at 65).

In the context of zoning that terminates inchoate rights to de-

---

[19] This court is not precluded from deciding the validity of the August issuance of the building permits although that issue had been raised in Appellant's complaint seeking injunctive relief in a separate proceeding, because the circuit court denied relief without reaching the merits. Sorenson v. Raymond, 532 F.2d 496 (5th Cir. 1976); Henderson v. Pence, 50 Haw. 162, 434 P.2d 309 (1967); 18 C. Wright & A. Miller, Federal Practice and Procedure § 4445 (1981).

Ministerial issuance of a building permit requires processing for compliance with conditions attached to prior discretionary approvals, *see* note 9, *supra.* Here, the zoning ordinance required compliance with all applicable state and county laws, rules, and regulations prior to construction (R. 30); the subdivision and SMA permit approvals required state health department approval of sewage disposal plans for the development (R. 47, 50), and the SMA permit Order prohibited issuance of any building permit until "sewage disposal requirements are resolved with the Department of Health." (R. 47).

Health department approval of the first proposed sewage disposal site violated HRS § 205A-29(b) (Supp. 1981), because the site did not have the required SMA permit (R. 71, 143, 148). As a result, the health department intended to revoke its approval, but the Developers subsequently proposed a new plan with a different disposal site obviating the SMA permit problem, and those plans received state approval on October 31, 1980 (R. 463).

velop land, it is well established that such regulation is a legitimate exercise of the police power, *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365 (1926), and that zoning by referendum is compatible with due process, *City of Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668 (1976). The Supreme Court has nonetheless recognized that rezoning may rise to the level of a constitutional deprivation of property rights where "the ordinance does not substantially advance legiti-· mate state interests . . . or denies an owner economically viable use of his land." *Agins v. City of Tiburon,* 447 U.S. 255, 260 (1980) (citation omitted).[20] No precise rule has been established for determining when a "taking" has occurred through rezoning, but it is clear that the constitutionally permissible balance between public and private interests allows diminution in value of the owner's land absent a total prohibition on development. *Id.* at 260-62. *See Burrows v. City of Keene,* 121 N.H. 590, 432 A.2d 15 (1981) (inverse condemnation by rezoning property from rural to conservation thereby limiting use to open space).

The 1980 zoning referendum satisfied constitutional require-ments as applied to the Nukolii development.[21] First, the rational basis for preserving agricultural zoning of the 25-acre parcel is underscored by compatibility with the county zoning of bordering acreage, which prohibits resort development. Second, the Develop-ers purchased the land in 1974 when it was zoned agriculture and open space, and their rights to use and develop the parcel consistent with that zoning remain unchanged as a result of the referendum.

---

[20] *Accord,* San Diego Gas & Elec. Co. v. City of San Diego, 450 U.S. 621, 636 (1981) (Brennan, J., dissenting). *See also* Allen v. City & County, *supra* (government may invoke power of eminent domain to enforce rezoning where zoning estoppel other-wise precludes enforcement).

[21] In contrast, the constitutionality of the resort zoning ordinance itself may be suspect because of the "in lieu" payment required under the ordinance as a "fee for recreational facilities and outright contribution for its first phase" of authorized development. (R. 28). We do not consider whether the payment was reasonably related to the county needs that would arise as a result of the development because repeal of the ordinance makes the issue moot. *But cf.* J.E.D. Assocs., Inc. v. Town of Atkinson, 121 N.H. 581, 432 A.2d 12 (1981) (blanket dedication requirement un-constitutional when applied without individual consideration for the project seeking approval).

When a property owner has actually proceeded toward development pursuant to then existing zoning, the initial inquiry is whether a developer's actions constituting irrevocable commitments were reasonably made or were speculative business risks not rising to the level of a vested property right. *See* Cunningham & Kremer, *supra,* at 662-64, 718. Thus, the Developers may not establish "a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 130 (1978). The particular circumstances of each case will determine whether "regulation has interfered with distinct investment-backed expectations" sufficient to require compensation therefor. *Id.* at 124. *See Kaiser Aetna v. United States,* 444 U.S. 164 (1979).

Our prior estoppel analysis resolves these constitutional considerations against the Developers. Before certification of the referendum, they had only a reasonable belief that the Nukolii site could be developed in accordance with the resort zoning. After certification, the most basic requirement for development — zoning compliance — became speculative. Subsequent tokens of governmental assurance were tarnished and could not give rise to reasonable expectations upon which to base investments. The record further supports the speculative nature of the Developers' expenditures: The referendum was discussed three times in the SMA permit decision of the County; it was a pivotal provision in the loan agreement covering the proposed condominium construction; and potential investors were warned that their rights under a sales contract were subject to the referendum results. Together, the Developers' expenditures and site preparation work constituted business risks rather than a basis for constitutional claims.

Other jurisdictions have developed a harsh rule denying either estoppel or vested rights effect absent substantial construction in reliance on a valid building permit. *See, e.g., Avco Community Developers v. South Coast Regional Commission,* 17 Cal.3d 785, 553 P.2d 546, 132 Cal. Rptr. 386 (1976), *appeal dismissed and cert. denied,* 429 U.S. 1083 (1977) (statutory mandate); *Spindler Realty Corp. v. Monning,* 243 Cal. App.2d 255, 53 Cal. Rptr. 7, *cert. denied,* 385 U.S. 975 (1966) (valid building permit is threshold requirement for establishing vested right); *Steuart Petroleum v. Board of County Commissioners,* 276

Md. 435, 443-44, 347 A.2d 854, 860 (1975); *Brett v. Building Commissioner*, 250 Mass. 73, 145 N.E. 269 (1924) (sustaining revocation of building permit after landowner entered into construction contracts and completed excavation for foundation). We are persuaded that the application of our rule in this case has no more harsh effect and comports with the flexible formula "for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government" under the fifth and fourteenth amendments. *Penn Central Transportation Co. v. New York City, supra,* at 124.

Because the referendum was certified before any post-zoning approvals were obtained, preliminary or otherwise, enforcement of the 1980 referendum, which returned the permitted land use for the Nukolii site to the prepurchase zoning, does not offend principles of equity or constitutional guarantees. Since they acquired no irrevocable rights to construct the resort complex by virtue of the intervening events, the Developers have no constitutional claim that a taking has occurred.

## V.

Reversed and remanded with instructions to enter summary judgment for Appellant and to order revocation of the condominium and hotel building permits, to restrain any further construction on the Nukolii site, to mandate refund by the County of the "in lieu" fee paid by the Developers pursuant to the resort zoning ordinance, and to hear requests for such other relief as the court deems proper.[22]

---

[22] No argument or evidence has been presented respecting the remedy of a mandatory injunction compelling the removal of any completed improvements on the Nukolii site. We are therefore unprepared to provide specific instruction regarding the issuance of such an injunction. However, as the issue is likely to arise on remand and this court has yet to pass on the issuance of such injunctions for zoning violations, we feel that a brief discussion of the matter is appropriate to provide further guidance to the trial court.

Mandatory injunctions are, of course, permitted as an appropriate remedy for zoning violations. Jurisdictions differ however in their willingness to grant such injunctions. At one extreme it is presumed that such an injunction is the appropriate

*Sidney M. Wolinsky (Karen M. Holt, Lawrence D. McCreery and Linda B. Levy* on the briefs) for respondent-appellant.

*Walton D. Y. Hong (Masuoka & Hong* of counsel) for respondents-appellees.

*Michael J. Belles,* Deputy County Attorney, County of Kauai, for petitioner-appellee and third-party defendant-appellee.

---

remedy and it is the defendant's burden to prove that such enforcement would not be of benefit to the health, safety and welfare of the public. City of Chicago v. Handler, 288 N.E.2d 714 (Ill. App. 1972). Conversely, it has been held that such an injunction should normally issue "only in cases of necessity where serious injury is being inflicted or will be inflicted." City of Dallas v. Gaechter, 524 S.W.2d 400, 402 (Tex. Civ. App. 1975).

We conclude that where, as in this case, a defendant does not intentionally violate underlying zoning, the latter rule should serve as the standard governing the issuance of a mandatory injunction for the removal of a completed improvement. For, absent conscious wrongdoing, we believe that the severity of the remedy should be reserved for circumstances where the waste engendered by the destruction of a completed improvement is clearly justified by preservation of the interests protected by the zoning involved. *See, e.g.,* Zelios v. City of Dallas, 568 S.W.2d 173 (Tex. Civ. App. 1978) (mandatory injunctive relief is proper when defendant acts with full knowledge that his acts are wrongful).

This is not to say the complainants are without recourse in the absence of a demonstration of "serious injury". Alternative remedies available to them include damages or the fashioning of other injunctive relief which would mitigate any harm caused by the offending structure.