907 P.2d 745

Mark Scully ARTHUR, Peter Linn Arthur, Philip S. Arthur, Jr., Paul F. Arthur, Mary Arthur Schwed and Ann Arthur Johnston, Plaintiffs–Appellees,

v.

David Allen SORENSEN, Valerie Ann Sorensen, Stacy Tuck Jung Wong, Tetsuya Yamamoto, Patrick Kwan Lynn Lau, Steven K. Lau, Susanne L. Mingrone, Jo Anne L. Lau, Jason K. Lau, Lau Enterprises, a Hawai'i general partnership, Defendants–Appellants,

and

John Does 1–10, Jane Does 1–10, Doe Partnerships 1–10, Doe Corporations 1–10 and Doe Entities 1–10, Defendants.

No. 17889.

Supreme Court of Hawai'i.

Nov. 30, 1995.

Gene K. Lau, of Lee, Kim, Wong, Yee & Lau, William C. McCorriston and Patrick K. Lau, of McCorriston, Miho & Miller, on the briefs, Honolulu, for defendants-appellants.

Steven Guttman, on the briefs, Honolulu, for plaintiffs-appellees.

MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

Defendants–Appellants David Allen Sorensen, et al. (collectively "buyers") appeal from a judgment and five prejudgment orders issued by the first circuit court in a contract dispute with the Plaintiffs–Appellees (collectively "trust beneficiaries"), beneficiaries of the Philip S. Arthur and Sarah L. Arthur Revocable Trusts (Trusts). In addition to preliminary matters of appellate jurisdiction, the fundamental issue raised in this case is a matter of statutory interpretation regarding Hawai'i Revised Statutes (HRS) § 514A–62(e) (1993).[1]

## I. BACKGROUND

The facts in this case are not disputed. On or about November 29, 1988, the Trusts sold a piece of property to S & G Developers (developers), a limited partnership composed of Stark Development, Ltd. and Gray Development, Inc. The developers intended to build the Waterpark Towers Condominium Project (the project) on this site. Accordingly, the Trusts obtained, as part of the sales price, seven options to purchase as yet to be built apartments at a discounted price in exchange for selling this land to the developer.[2] The Trusts listed these options with

---

**1.** HRS § 514A–62(e) provides that, "[n]o obligation to purchase an apartment under any agreement for the *purchase or reservation* of an apartment entered into prior to the purchaser's receipt of a final public report is enforceable against the purchaser under such agreement." (Emphasis added.)

**2.** The underlying land sales agreement (Deposit, Receipt, Offer and Acceptance, or "DROA") between the Trusts and the developer is not part of the record. However, an August 17, 1988 ad-

dendum to the DROA indicates that the Trusts received options to purchase seven residential condominium units from among those units that eventually were to be made available to the general public, subject to the following terms and conditions: the sales price was set at ninety-five percent of the price listed by the developer and in effect at the time the options are exercised; and, the options may be exercised when 1) the developer offers units to the general public, and 2) a balance of purchase-money remains due for the land conveyed to the developer by the Trusts

Horita Realty and later agreed to sell five of them to the buyers for $400,000.[3]

In a signed letter agreement, dated May 24, 1990 (letter agreement), the buyers agreed to pay the Trusts in two installments of $200,000 each. The buyers completed the initial payment after (a) the Trusts assigned their option rights to the trust beneficiaries (on or about June 15 or 18, 1990) and (b) the buyers executed "reservation and sales agreements" with the developer for the apartments.[4] The buyers agreed to pay another $200,000 upon the earlier of (i) the issuance of the final public report or (ii) one year after execution of the reservation and sales agreements between the buyers and the developer.[5]

Sometime after August 1991—i.e., over a year after the buyers entered into reservation and sales agreements with the developer—the trust beneficiaries unsuccessfully attempted to collect the remaining $200,000 due under the promissory notes. The developer later issued a final public report on September 6, 1991.[6] *See* HRS § 514A–40 (1993) (listing conditions under which a final public report may be issued prior to the completion of a project's construction). One

week later, on September 13, 1991, the buyers sent a letter to the trust beneficiaries citing HRS § 514A–62 for their claim that the letter agreement was invalid and calling for rescission of the agreement, repayment (with interest) of the $200,000 already paid, and cancellation of the promissory notes.

The trust beneficiaries subsequently filed an eight count first amended complaint against the buyers, asserting claims of: breach of contract (Counts I, II, and IV)[7]; breach of implied covenant of good faith and fair dealing (Count III); unjust enrichment (Count VI); fraud and misrepresentation (Count VII); promissory estoppel (Count V); and punitive damages (Count VIII). The buyers filed counterclaims for invalid contract, unjust enrichment, and conversion.

The trust beneficiaries and the buyers each moved for summary judgment on the complaint and the counterclaims. The circuit court entered orders granting the trust beneficiaries' motion as to the complaint and denying the buyers' motion. The order simply granted the motion for summary judgment and did not enter judgment against the buyers. The buyers moved for reconsideration

under the DROA. Sometime later, the Trusts or the trust beneficiaries reserved seven apartments: North Tower units 3004, 2604, 1401 and 703, and South Tower units 2908, 1905, and 605 (the interests in the five apartments on the upper floors were later conveyed to the buyers). Although the process by which these seven specific apartments were selected is not clear, the trust beneficiaries contend that the Trusts never exercised their options with respect to any of the seven apartments.

3. At a hearing before the circuit court on the parties' respective motions for summary judgment, the trust beneficiaries' attorney indicated that his clients thought the options were worth as much as $800,000.

4. The terms and effective dates of these particular "reservation and sales agreements" are unclear because they are not contained in the record on appeal. An example of a reservation and sales agreement is provided below. *See infra* note 12. In any event, the buyers made the initial $200,000 payment sometime in August 1990 and, after the options were assigned and the "reservation and sales agreements" entered into, apparently paid Horita Realty a $50,595 commission pursuant to the letter agreement.

5. Payment was secured by means of three promissory notes, each dated August 21, 1990: 1) in

the sum of $50,000 jointly and severally executed and delivered by Patrick Kwan Lynn Lau and Lau Enterprises; 2) in the sum of $100,000 executed and delivered by Tetsuya Yamamoto; and 3) in the sum of $50,000 executed and delivered by Stacy Tuck Jung Wong. Furthermore, on August 14, 1991, Valerie Sorensen (representing her fellow buyers) wrote a letter to one of the trust beneficiaries acknowledging the balance due of $200,000 and seeking an extension until the start of construction.

6. The record on appeal includes only the cover page of this report. On July 10, 1992, almost eight months after the trust beneficiaries filed their original complaint against the buyers, *see infra* this section, the developer sent a letter to prospective purchasers informing them of material changes in the project—including redesign, delays, and a change from leasehold to fee simple—and seeking cancellation of all sales agreements.

7. Count I alleged breach of contract with respect to a letter agreement between the parties, Count II alleged breach of contract with respect to a promissory note, and Count IV alleged tortious breach of contract.

of the order granting summary judgment. The circuit court orally denied the motion and later entered an order denying that motion.

The buyers moved for leave to take an interlocutory appeal from the order granting the motion for summary judgment, the order denying the buyers' motion for summary judgment, and the oral order denying the motion for reconsideration. In the alternative, the buyers moved for certification of these orders pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b).[8] On February 15, 1994, the circuit court entered an order denying leave to take an interlocutory appeal from the orders, but granting the motion for certification. The order simply granted the motion without making any of the findings necessary for certification.

Meanwhile, the trust beneficiaries moved for entry of judgment pursuant to the order granting summary judgment, for HRCP Rule 54(b) certification of the judgment, and for an award of prejudgment interest, attorney's fees, and costs. On February 15, 1994, the circuit court entered an order granting the motion. The order awarded judgment to the trust beneficiaries in the amount of $200,000 as to counts I, II, III, and IV of the first amended complaint and adjudged the defendants jointly and severally liable to the trust beneficiaries for the awarded sum. Counts VII and VIII were dismissed. The order was certified under HRCP Rule 54(b) and contained the requisite finding that there was no just reason to delay the entry of judgment. The order also awarded prejudgment interest, attorney's fees, and costs to the trust beneficiaries.

On February 15, 1994, the court entered a separate judgment pursuant to the order in favor of the trust beneficiaries and against the buyers for $200,000 as to counts I, II, III and VI, but not as to count IV.

On March 8, 1994, the buyers filed a notice of appeal from: (1) the order granting the trust beneficiaries' motion for summary judgment; (2) the order denying the buyers' motion for summary judgment; (3) the order denying the buyers' motion for reconsideration of the order granting summary judgment; (4) the order denying leave to take an interlocutory appeal; (5) the order granting the motion for entry of judgment, prejudgment interest, attorney's fees, and costs; and (6) the judgment entered on February 15, 1994.

## II. *DISCUSSION*

### A. *Appellate Jurisdiction*

■ "It is well-settled that every court must determine as a threshold matter whether it has jurisdiction to decide the issue[s] presented. Moreover, subject matter jurisdiction may not be waived and can be challenged at any time." *Public Access Shoreline Hawaii v. Hawai'i County Planning Comm'n,* 79 Hawai'i 425, 431, 903 P.2d 1246, 1252 (1995) (internal quotation marks, ellipsis points, and citations omitted).

■ In the instant case, Count V of the first amended complaint and the buyers' counterclaims have not been dismissed or reduced to judgment. Thus, judgment is not final in this case because all rights and liabilities and all claims of all the parties have not been terminated. *M.F. Williams, Inc. v. City and County of Honolulu,* 3 Haw.App. 319, 322–24, 650 P.2d 599, 603 (1982). Absent entry of final judgment as to all claims, an appeal may be taken in this case only if leave to take an interlocutory appeal has been granted by the circuit court pursuant to

---

8. HRCP Rule 54(b) provides:

> **Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of the parties.

HRS § 641–1(b) (1993)[9] or if certification has been granted pursuant to HRCP Rule 54(b).

■ The order granting the motion for entry of judgment, prejudgment interest, and attorney's fees and costs entered judgment in favor of the trust beneficiaries and against the buyers on counts I, II, III, and IV, and was properly certified for appeal under HRCP Rule 54(b). *See Aged Hawaiians v. Hawaiian Homes Comm'n*, 78 Hawai'i 192, 200, 891 P.2d 279, 287, *cert. denied*, —— U.S. ——, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995) (citing *TBS Pacific, Inc. v. Tamura*, 5 Haw. App. 222, 228, 686 P.2d 37, 43 (1984)).

■ Although the judgment entered on February 15, 1994 entered judgment in favor of the trust beneficiaries and against the buyers on counts I, II, III and VI, the judgment was not certified under HRCP Rule 54(b). Furthermore, leave to take an interlocutory appeal was neither requested nor granted as to the order denying the defendant's motion for reconsideration. *See* HRS § 641–1(b), *supra* note 9. Leave to take an interlocutory appeal was also denied as to the orders granting and denying the parties' respective motions for summary judgment.

■ Similarly, the order granting the trust beneficiaries' motion for summary judgment simply granted the motion without entering judgment and was not certifiable under HRCP Rule 54(b); thus, the purported HRCP 54(b) certification of this order and the order denying the buyers' motion for summary judgment was improper. Finally, the order denying leave to take an interlocutory appeal is not appealable under HRS § 641–1(b).

Thus, we hold that appellate jurisdiction is properly invoked in the instant case only as to the February 15, 1994 order granting the trust beneficiaries' motion for entry of judgment, prejudgment interest, attorney's fees, and costs.

### B. *HRS § 514A–62*

■ The buyers claim that HRS chapter 514A, the Condominium Property Act, governs the sale of the options they purchased from the trust beneficiaries. Thus, the buyers contend that they can obviate their obligations under the letter agreement because they entered into that agreement before the developer issued its final public report. *See* HRS § 514A–62(e), *supra* note 1.

HRS § 514A–62(a) provides in relevant part:

> The *developer (or any other person offering any apartment in a condominium project prior to completion of its construction)* shall not enter into a contract or agreement for the sale or resale of an apartment which is *binding* upon any prospective purchaser until:
>
> (1) The commission has issued an effective date for a final public report on the project, and the developer has delivered, or caused to be delivered, to the prospective purchaser, either personally or by registered or certified mail with return receipt requested, a true copy of the final public report together with a true copy of all prior public reports on the project, if any, which have not been previously delivered to such prospective purchaser; . . . .
>
> (2) The prospective purchaser has been given an opportunity to read the report or reports; and
>
> (3) The prospective purchaser (A) executes the form of the receipt and notice set forth in subsection (d); and (B) waives the prospective purchaser's right to cancel; provided that if the prospective purchaser does not execute and return the receipt and notice within thirty days from the date of delivery of such reports, or if the apartment is con-

9. HRS § 641–1(b) provides:

Upon application made within the time provided by the rules of court, an appeal in a civil matter may be allowed by a circuit court in its discretion from an order denying a motion to dismiss or from any interlocutory judgment, order, or decree whenever the circuit court may think the same advisable for the speedy termination of litigation before it. The refusal of the circuit court to allow an appeal from an interlocutory judgment, order, or decree shall not be reviewable by any other court.

veyed to the prospective purchaser prior to the expiration of such thirty day period, the prospective purchaser shall be deemed to have receipted for the reports and to have waived the prospective purchaser's right to cancel.

(Emphases added.) As enacted in its original form in 1961, HRS § 514A-62 was designed "to protect the buying public" from losses resulting from the "loose handling of funds representing down-payments on individual apartment units[.]" Hse. Stand.Comm.Rep. No. 622, in 1961 House Journal, at 937–38. Furthermore, in 1967, the legislature

> close[d] the 'wholesaling loophole', by amending the present law to include[,] as persons covered by the obligation to give a public report to[,] both the developer and any other person offering a condominium unit prior to the completion of its construction. This broadening of the application of the act [was deemed] necessary in order to meet the practice in which developers sell portions of the project to large investors for resale, often an entire floor.

Hse.Stand.Comm.Rep. No. 822, in 1967 House Journal, at 795.

The Condominium Property Act also provides that the prospective purchaser may elect to cancel any agreement for the *purchase or reservation* of an apartment, unless this right has been waived pursuant to HRS § 514A-62(a), *supra:*

> at any time prior to the earlier of (1) the conveyance of the apartment to the prospective purchaser or (2) midnight of the thirtieth day following the date of delivery of the final public report to such purchaser, and, upon any such cancellation, [the purchaser] shall be entitled to a prompt and full refund of all moneys paid, less any

escrow cancellation fee and other costs associated with the purchase, up to a maximum of $250.

HRS § 514A-62(c); *see also* HRS § 514A-62(e), *supra* note 1.[10]

The buyers claim that the "options" they bought from the Trusts under the letter agreement are non-binding "reservations" that may be rescinded, before or after a final report is issued, pursuant to HRS § 514A-62(e). Thus, the fundamental question raised in this appeal is whether the buyers, as "option purchasers," are entitled to the prophylactic measures contained in HRS § 514A-62(e).

There are apparently two types of "reservations" contemplated by HRS chapter 514A. *Compare* HRS §§ 514A-16(a)(1)(A) (mentioning the "reservation of legal title under an agreement of sale") and -63(a) (mentioning "reservations, without limitation, including the merger or addition or phasing of a project"), *with* HRS §§ 514A-104 (mentioning a "reservation list" for prospective owner-occupants who have, inter alia, submitted an earnest money deposit) and -105(d) (requiring persons on the reservation list to *reaffirm* their intent to purchase after receiving the final public report). The first category of reservations—i.e., "sales contracts with reservations"—are ordinarily considered to be binding obligations. *See, e.g., Black's Law Dictionary* 1307 (6th ed. 1990) (defining "reservation" as "[a] clause in a deed or other instrument of conveyance by which the grantor creates, and reserves to himself [or herself], some right .'. . in the estate granted").[11] The second category—i.e., "reservation and sales agreements"—involves nonbinding rights reserved for the the prospective purchaser in exchange for the payment of an earnest money deposit or downpayment, which is held in trust by the developer

---

**10.** Use of the term "reservation" in HRS § 514A-62 originated in 1984. *See* 1984 Haw. Sess.L.Act 58, § 5 at 108, 110. The term is not defined in the Condominium Property Act. The only marginally relevant legislative history for this amendment indicates that "a purchaser should not be precluded from exercising a right of rescission provided by contract." Sen. Stand.Comm.Rep. No. 362-84, in 1984 Senate Journal, at 1158.

**11.** In the context of condominium sales, developers occasionally enter into binding contracts for the sale of apartments while reserving various rights—for example: the right to alter the physical layout of the apartment; the option to cancel the offering if a specified number of units are not sold; the right to amend the by-laws; and, the right to alter unit prices. 4b R. Powell, *Powell on Real Property* ¶¶ 632.5[2][c][i] and [ii] at 54-144 (1995).

subject to certain restrictions. *See* HRS § 514A–67 (1993) (governing the retention and disbursement of trust funds for various development purposes).

Two cases decided by the appellate courts of this state have mentioned "reservation agreements" in the context of HRS chapter 514A or its predecessor, HRS chapter 514. *See Nakamura v. Kalapaki Associates*, 68 Haw. 488, 494–95, 718 P.2d 1092, 1096–97 (1986) (holding that purchasers were entitled to a refund and cancellation of their reservation agreement, notwithstanding their receipt of a final report and subsequent affirmation of the agreement, because they were not notified of their right to cancel as required by former HRS § 514A–66 whenever a final report is issued more than one year after the preliminary report) [12]; *Hugh Menefee, Inc. v. Hale Kekoa Joint Venture*, 2 Haw.App. 311, 313, 314, 631 P.2d 597, 599, 599 (1981) (per curiam).[13] We are not aware of any cases involving "sales contracts with reservations" under HRS chapter 514A.

Because both option contracts [14] and "reservation and sales agreements" are not *per se* binding upon prospective optionees or purchasers,[15] the buyers seem to argue that the

---

12. The reservation agreement in *Nakamura* provided in relevant part:

    if at the time of execution of this Agreement ... a Final Public Report for the Project has not been issued ... this Agreement shall not be legally binding upon either the Purchaser or the Seller. In such event, this Agreement shall constitute a "reservation," not a binding contract, and *Seller shall have no obligation to sell and Purchaser shall have no obligation to buy the property.* A reservation agreement cannot become a binding sales agreement unless and until a Final Public Report is issued on the Project, the Purchaser has receipted or is deemed to have receipted therefor, and the Seller and Purchaser execute a *separate confirmation letter* in which they agree to render this Agreement a binding contract. A RESERVATION MAY BE TERMINATED AT ANY TIME BEFORE IT IS RENDERED A BINDING CONTRACT, WITH OR WITHOUT CAUSE, AT THE OPTION OF EITHER PARTY, BY WRITTEN NOTICE OF SUCH TERMINATION TO THE OTHER PARTY. In the event of such termination, the Seller shall cause Escrow to refund all payments previously made by Purchaser without interest, and neither party shall have any other or further liability hereunder or with respect to the Project; *provided that if Purchaser terminates this reservation, then Escrow shall deduct from the refund to Purchaser the escrow cancellation fee and all costs incurred by the Seller, Escrow, or any lending institution in processing this Agreement or the loan application;* if Seller terminates this reservation, then Seller shall pay such fees and costs.

    68 Haw. at 491–92, 718 P.2d at 1095 (brackets omitted and emphases added) (uppercase phrase in original). Therefore, *Nakamura* could conceivably be read to suggest that, in the context of condominium sales in Hawai'i, a "reservation" is virtually the same as an option contract. In other words, a prospective purchaser holding either an option or a reservation is not obligated to purchase an apartment until he or she expressly accepts the developer's open offer. Consistent with such a reading, the only distinction would be that the developer must sell under an "option contract," whereas the developer could refuse to enter into an agreement of sale with a person holding a "reservation."

13. The listing contract at issue in *Hugh Menefee* contained provisions that referred to conditions under which contracts for the sale or reservation of an apartment would become "binding." Whereas the appellees, who had prevailed in an earlier summary judgment motion, claimed that the parties intended that "binding" be defined in accordance with HRS chapter 514, the ICA's per curiam opinion suggested that the contract could also fairly be interpreted as excluding the relevant statutory provisions from the contractual term "binding." 2 Haw.App. at 314–15, 631 P.2d at 599–600. Accordingly, the court reversed and remanded for determination of this genuine issue of material fact. *Id.* at 315, 631 P.2d at 600.

    In *Kauai County v. Pacific Standard Life Ins.*, 65 Haw. 318, 653 P.2d 766 (1982), this court also briefly mentioned reservation agreements in the context of condominium sales, but did not directly refer to HRS chapter 514A. *See id.* at 334 n. 16, 653 P.2d at 778 n. 16.

14. An "option" is defined in relevant part as a:

    Right of election to exercise a privilege. Contract made for consideration to keep an offer open for prescribed period. A right, which acts as a continuing offer, given for consideration, to purchase or lease property at an agreed upon price and terms, within a specified time.... An option to purchase or to sell *is not a contract to purchase or sell*, as optionee has the right to accept or to reject the offer, in accordance with its terms, and *is not bound.*

    *Black's Law Dictionary* 1094 (6th ed. 1990) (emphases added) (citations omitted). *See also In re Estate of Damon*, 5 Haw.App. 304, 311, 689 P.2d 204, 208 (1984) (defining "option to purchase real property").

15. Nevertheless, where the developer and a prospective purchaser confirm the reservation and sales agreement subsequent to the issuance of a

option contracts they purchased from the Trusts are encompassed by the term "reservation" in HRS § 514A–62(e). *Cf. Heatherly v. Hilton Hawaiian Village*, 78 Hawai'i 351, 355, 893 P.2d 779, 783 (1995) (citing *In re Taxes Hawaiian Pineapple Co.*, 45 Haw. 167, 178–79, 363 P.2d 990, 997 (1961)).[16]

The circuit court, in ruling on the parties' respective motions for summary judgment, implicitly recognized the potential merit of such a claim by "find[ing]" that:

> 1) *Under the factual circumstances of this case, it is not necessary to determine whether the word "option" means the same or substantially the same as the word reservation under Chapter 514 H.R.S.* The subject option[,] which was secured by the owners of the property[,] was part of the development negotiations between the owners of the land and the developer. The owner had equal if not greater bargaining power than the developer. The owner cannot be envisioned to be within that class (of prospective condominium unit purchasers) which Chapter 514 was designed to protect. Defendants, allegedly sophisticated purchasers, stand in the shoes of the owners as purchasers of the option.
>
> 2) It appears to this Court that what is merely involved is the sale of a valuable contractual right from the owners to the defendants. That sale can be enforced independently of Chapter 514[A].

(Emphasis added.) *See also* 8/16/92 Transcript at 18 (quoting the court as stating that "this situation is different from the situation where a stranger walks off the street and *makes a reservation and calls it an option.*

I think, there, your argument's very pertinent[.]") (emphasis added).

We are persuaded by the circuit court's reasoning in this case. The buyers obtained the rights, previously held by the trust beneficiaries via assignment from the Trusts, to purchase apartment units from the developer upon favorable terms. Clearly, the buyers expected to profit from this investment opportunity once the units became available for sale to the general public, due to a belief that apartment prices would be substantially higher than the favorable prices obtained by purchasing the options. Accordingly, the buyers executed "reservation and sales agreements" with the developer in order to fulfill a condition of the letter agreement under which the options were purchased. The buyers clearly were not bound to perform under the "reservation and sales agreements" with the developers. *See* HRS § 514A–104(a)(5) (providing for the return of deposits without interest).[17] However, notwithstanding the buyers' ability to rescind their reservation and sales agreements with the developer, they may not rely upon HRS § 514A–62(e) to nullify the letter agreement with the Trusts.

The clear intent of HRS § 514A–62 is that prospective purchasers will be protected from unscrupulous and/or fiscally irresponsible developers by requiring all deposits to be placed in escrow, *see* HRS § 514A–65 (1993),[18] and allowing cancellation of reservation and sales agreements via execution of the statutorily required "receipt and notice" form, which includes the right to a "refund of any downpayment or deposit, less any escrow

---

final public report, *see, e.g., supra* note 12, such an agreement becomes binding. Furthermore, an agreement *entered into prior to issuance of a final public report* would be binding if the prospective purchaser waived his or her right to cancel. *See* HRS § 514A–62(a)(3), *supra*.

**16.** In *Heatherly*, we vacated summary judgment *based upon uncontroverted evidence submitted by the losing party* and remanded for determination of the factual question whether "porterage" is included within the trade meaning of "gratuities." 78 Hawai'i at 355 n. 6, 357–58, 893 P.2d at 783 n. 6, 785–87.

**17.** *See also supra* note 12 (discussing a reservation agreement in *Nakamura*, which did not be-

come binding unless both the seller and the prospective purchaser reaffirmed its terms).

**18.** HRS § 514A–65 provides:

> All moneys paid by purchasers prior to the purchaser's receipt of the final public report on the project shall be *deposited in trust under escrow management* with instructions that no disbursements shall be made from such trust funds on behalf of the seller until the contract has become binding, and the requirements of sections 514A–40 and 514A–63 have been met.

(Emphasis added.) HRS § 514A–40 lists the requirements for issuing an effective date for a final public report. HRS § 514A–63 governs the prospective purchaser's rights of rescission.

cancellation fees and other costs, up to $250." HRS § 514A–62(d). The references to "escrow" in these sections and in HRS § 514A–62(c) belie the buyers' argument that, as optionees, they fall within the class protected by HRS § 514A–62. The money the buyers paid for the options was not placed in escrow and cannot be likened to a downpayment or deposit toward the purchase of an apartment. Upon "cancellation" of the letter agreement by the buyers, there would be no "downpayment or deposit" to return to them, because they bought an opportunity (i.e., the Trusts' rights to purchase apartments at a discounted price) and not apartments. It is inconceivable that the Trusts would conditionally "sell" the options to the buyers subject to a full refund of the sales price, with interest, in the event that the options were not later executed by the buyers in their sole discretion. Even if this were the highly unlikely agreement of the parties, it is nowhere set forth in the letter agreement drafted by Valerie Sorenson, one of the buyers. Consequently, the lost opportunity costs associated with the purchase of these options must be borne by the buyers rather than by the Trusts.

Thus, we hold that the circuit court properly granted summary judgment in favor of the Trusts and entered judgment against the buyers.

### C. *Prejudgment Interest*

The trust beneficiaries argue that the circuit court erred by deviating from the statutory interest rate of ten percent when awarding prejudgment interest. The buyers retort that the issue of prejudgment interest cannot be raised without a cross-appeal.

In *Shoemaker v. Takai,* 57 Haw. 599, 561 P.2d 1286 (1977), this court held that an appellee is not ordinarily entitled to attack a judgment without a cross appeal. *Id.* at 607, 561 P.2d at 1291; *see also* 9 J. Moore, *Moore's Federal Practice* ¶ 204.11[3] at 4–52 (1995). However, because the appellant raised an issue related to the award of attorney's fees to the appellee, the court applied

an exception to the general rule. Notwithstanding the appellee's failure to file a cross appeal, the court decided a subsidiary issue related to the trial court's concurrent award of attorney's fees to the appellant. *Id.* (indicating that the latter issue was "closely related, in substance, to [the] question raised on appeal"); *see also In re Estate of Lorenzo,* 61 Haw. 236, 239, 602 P.2d 521, 525 (1979) (deciding the subsidiary issue whether the trial court properly granted a motion for jury trial because it was necessarily *precedent* to the question on appeal—i.e., whether the trial judge erred in failing to disqualify himself after having presided over the previous bench trial).

In the instant case, the question whether the circuit court erred by granting prejudgment interest in an amount less than is statutorily mandated, *see* HRS § 478–2 (1993),[19] is *not* subsidiary to, or "closely related, in substance, to[,]" the question raised by the buyers—in other words, whether holders of option contracts are entitled to the prophylactic measures contained in HRS § 514A–62(e). Thus, we decline to review the award of prejudgment interest in this case because it has not been properly raised.

### III. *CONCLUSION*

We hold that the circuit court properly granted summary judgment in favor of the trust beneficiaries and against the buyers. Thus, we affirm the court's order granting the trust beneficiaries' motion to enter judgment and awarding prejudgment interest, attorney's fees, and costs.

---

19. HRS § 478–2 provides in relevant part that, "[w]hen there is no express written contract fixing a different rate of interest, interest shall be allowed at the rate of *ten per cent* a year ... [f]or money due on any ... promissory note ... after it becomes due[.]" (Emphasis added.)